[Cite as *Menlo Realty Income Properties 28, L.L.C. v. Franklin Cty. Bd. of Revision*, 2019-Ohio-4872.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Menlo Realty Income Properties 28, LLC, | : | |
| Appellant-Appellant, | : | |
| | : | No. 19AP-316 |
| v. | : | (BTA No. 2016-445) |
| Franklin County Board of Revision et al., | : | (REGULAR CALENDAR) |
| | : | |
| Appellees-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on November 25, 2019

**On brief:** *Sleggs, Danzinger & Gill Co., LPA,* and *Todd W. Sleggs,* for appellant. **Argued:** *Todd W. Sleggs.*

**On brief:** *Rich and Gillis Law Group, Mark H. Gillis,* and *Richelle L. Thoburn Ford,* for appellee Columbus City Schools Board of Education. **Argued:** *Mark H. Gillis.*

APPEAL from the Board of Tax Appeals

NELSON, J.

{¶ 1} In this property valuation case from the Board of Tax Appeals, property owner Menlo Realty Income Properties 28, LLC ("Menlo") seems to argue for a rule that despite a recent arms-length sale, the taxing authorities must automatically discount the sale value of any leased property by the vacancy rate in the area without regard to whether the lease at the time of sale was above, below, or at market value. But a lease in any area, including an area with less than a 100% occupancy rate, at least theoretically can be above-market, below-market, or at market value, and simply knowing the neighborhood's vacancy rate does not by itself establish which of these descriptions fits any particular circumstance. The absolute rule Menlo proposes has no basis we can discern in law or logic. And because Menlo has failed to point us to a sufficient showing that the lease at issue here (to CVS) was

at above-market value for the landlord at the time of sale or that the purchase price consequently (or otherwise) could not be considered an accurate indicator of the property's fee simple value, we will overrule Menlo's two related assignments of error and affirm the BTA determination.

{¶ 2} Menlo purchased the subject retail condominium at Suite 1A of 109 South High Street in Columbus on June 20, 2013 for $4,865,000 (which amounted approximately to $460.18 per square foot). *See* Menlo's Ex. 1, February 22, 2016 appraisal by Samuel D. Koon & Associates, LTD ("Koon appraisal") at A-5. The Columbus City Schools then filed a complaint asking that the real property tax assessment for that parcel be increased for tax year 2014 from its previously assessed $1,600,000 valuation; the Franklin County Board of Revision, over Menlo's protestations, pegged the property's value at the new sale price; the Board of Tax Appeals agreed with that result; and Menlo appealed to the Supreme Court of Ohio.

{¶ 3} In the wake of a spate of cases in which the Board of Tax Appeals appeared to have ignored statutory amendments by taking an arms-length sale price as conclusive proof of value without consideration of competing proffered evidence, the Supreme Court ruled: "Because the Board of Tax Appeals ('BTA') did not fully consider the appraisal evidence presented by * * * Menlo * * * , we vacate the decision of the BTA and remand the case for further proceedings on the authority of *Terraza 8, L.L.C. v. Franklin Cty. Bd. of Revision*, 150 Ohio St.3d 527, 2017-Ohio-4415, * * * and *Spirit Master Funding IX, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, [155 Ohio St.3d 254], 2018-Ohio-4302 * * *." *Menlo Realty Income Props. 28, L.L.C. v. Franklin Cty. Bd. of Revision*, 155 Ohio St.3d 258, 2018-Ohio-4305, ¶ 1.

{¶ 4} *Terraza* explained that 2012 amendments to R.C. 5713.03 "required county auditors to determine 'the true value of *the fee simple estate, as if unencumbered,* of each separate * * * parcel of real property and of buildings, structures, and improvements located thereon.' " 2017-Ohio-4415, ¶ 15 (emphasis in original), quoting R.C. 5713.03. Those amendments also provided that "concerning recent arm's-length sales, * * * 'the auditor *may* [rather than the former "*shall*"] consider the sale price * * * to be the true value for taxation purposes.' " *Id.* (emphasis in original), quoting R.C. 5713.03. So the real property has to be valued as if no lease had existed at the time of sale. (That makes sense

on the view that the purchaser assumes lease rights and obligations that may add to or detract from the value the property would have absent the lease.) "The General Assembly reinforced this policy change by * * * * [allowing] taxing authorities to consider non-sale-price evidence – particularly evidence of encumbrances and their effect on sale price – in determining the true value of property that has been the subject of a recent arm's-length sale." *Id.* at ¶ 27.

{¶ 5} *Terraza* continued by instructing that an "actual, recent * * * arms-length" sale "creates a rebuttable presumption that the sale price reflected true value." *Id.* at ¶ 33. "Market rent becomes relevant only if an opponent presents it as evidence in an attempt to rebut a sale price." *Id.* at ¶ 34. But where a party has "presented appraisal evidence that purports to explain why the sale price did not reflect the value of the unencumbered fee-simple estate," the BTA must properly consider such evidence. *Id.* at 39.

{¶ 6} *Spirit Master* further underscored that the sale price "only 'presumptively represents the value of the unencumbered fee-simple estate,' " and that the taxing authorities must consider also " 'any other evidence the parties present that is relevant to the value of the unencumbered fee-simple estate.' "  2018-Ohio-4302 at ¶ 6, 9 (citations omitted).

{¶ 7} On remand of this case from the Supreme Court, the BTA on tax day 2019 acknowledged that appraisal evidence can serve to rebut the value presumption created by a sale price, and considered Menlo's argument "that, because the subject property sold pursuant to an above-market lease (a 'negative leasehold interest' as described in Menlo's brief to this board prior to the remand), the sale did not reflect the property's unencumbered fee simple value." April 15, 2019 BTA Decision and Order at 2 (characterizing Menlo's position). The BTA noted that "[w]e must therefore determine whether the lease was at market terms." *Id.*

{¶ 8} The BTA assessed the "nine rent comparables" provided in the Koon appraisal. It did not buy the Koon opinion that the 10,572 square foot subject property (which was purchased subject to a lease at $26.85/SF) would on the open rental market go for the same rental rate of $25.00 per square foot as "a 3,500 SF space in a building on the same block as the subject property that was built in 1958"; rather, the BTA thought, "[i]t seems likely that the higher actual rental rate for the subject property reflects the fact that

the subject property is significantly newer than most other comparable spaces in the Columbus CBD." *Id.* at 3. The board did not accept the Koon appraisal's "final value estimate" of $3,900,000. *Id.* at 2-3.

{¶ 9} "We acknowledge that other factors may cause a lease rate to be above market," the board's analysis continued, "including the creditworthiness of the tenant. * * * * However, Menlo has provided this board with no analysis or evidence demonstrating what, if any, effect the creditworthiness of CVS had on its lease rate. Moreover [despite a suggestion that the lease rate may have included build-out costs], there is no evidence to support such statement nor is there any indication of what portion of the rental rate is attributable to such construction costs." *Id.* at 3.

{¶ 10} Finding that Menlo "failed to present probative evidence demonstrating that the subject's lease rate * * * was above market," the BTA determined that the sale price reflected the true value of the property as if unencumbered. In reaching that conclusion, it found further "support" in the Koon appraisal's reference to "the sale of a Walgreens on Harrisburg Pike (comparable sale #3) in May 2015 for $6,963,666 (or $461.29/SF)," as compared to the $460.18/SF price Menlo paid. *Id.* "Mr. Koon appears to have made only two adjustments to that [Walgreens] sale: (1) downward for occupancy (comparing the comparable's 100% occupancy to an estimated 92.5% market occupancy for the subject property['s neighborhood]), and (2) upward for location (inferior compared to the subject). The amount of his overall downward adjustment is not clear from his report and testimony; however, we find comparable sale #3 a good indication of the market on tax lien date." *Id.*

{¶ 11} Appealing to this court, Menlo makes two assignments of error:

> [1.] The Board of Tax Appeals decision and order fails to consider that the subject property sold leased fee (encumbered) with an occupancy of 100% when the unrebutted appraisal testimony in the record showed that market occupancy was 91.3% at the beginning of 2014. As a result the Board of Tax Appeals decision and order is unreasonable and unlawful.
>
> [2.] The Board of Tax Appeals consideration of the Walgreens (encumbered) sale at $461.29 per square foot as corroborating evidence for the encumbered sale of the subject property at $460.18 per square foot ignores the fact that both sales needed to be adjusted to market occupancy of 91.3% (or 92.50% as Mr. Koon did) in order to determine unencumbered fee simple

> value under R.C. 5713.03. As a result the Board of Tax Appeals decision and order is unreasonable and unlawful.

Appellant's Brief at 7, 9.

{¶ 12} "We must affirm the BTA's decision if it was 'reasonable and lawful.' R.C. 5717.04. In making this determination, we must consider legal issues de novo, * * * and defer to findings concerning the weight of evidence so long as they are supported by the record * * * ." *Terraza*, 2017-Ohio-4415 at ¶ 7 (citations omitted).

{¶ 13} The two assignments of error somewhat merge in Menlo's arguments, and we consider them together. Menlo submits that the BTA "failed to recognize the need to adjust the sale data in the appraisal to reflect market occupancy." Appellant's Brief at 5. Acceptance of the sale price as reflecting the property's unencumbered fee simple value, Menlo urges, "is unreasonable and unlawful because the unrebutted appraisal evidence showed that market occupancy was 92.5%, not 100%"; thus, the board erred when it "used a sale of property that was 100% occupied in adopting the June 2013 sale price." *Id.* At the time of sale, Menlo elaborates, the property was subject to a lease that did not expire for at least another 13 years, *id.* at 7: consequently, Menlo contends, "the lease encumbering the property at an occupancy of 100% was not reflective of market conditions as of January 1, 2013 (10% vacancy) and * * * * the June 20, 2013 leased fee sale of the property did not reflect the unencumbered fee simple value of the real property * * * ." *Id.* at 8.

{¶ 14} But as Menlo's counsel confirmed at argument, the value calculations its appraiser made did not incorporate or depend on the specific duration of the lease, and Menlo's briefing does not direct us to any place in the record that would require the BTA to conclude that having that particular CVS lease for its particular duration and at its particular rental rate inflated (or deflated) the sale value by any particular amount. Rather, Menlo falls back on a highly generalized argument that because a long-term "lease at 100% occupancy * * * exceeds market occupancy [rates] * * * , the June 20, 2013 leased fee sale of the property cannot be used to value the unencumbered fee simple interest in the property * * *." *Id.* at 13.

{¶ 15} That appears to be another way of saying that whenever occupancy rates in a neighborhood are less than 100%, the sale value of a leased property is *never* its unencumbered value. But that proposition eviscerates, for properties under lease, the

"rebuttable presumption that the sale price reflected true value," *Terraza*, 2017-Ohio-4415, at ¶ 33, because circumstances generally conspire to generate some sort of commercial space vacancy rate. A presumption so limited is not much of a presumption, and we do not read *Terraza* or related precedents to rest on such sweeping generalities divorced from any sort of more detailed analysis.

{¶ 16} Of course, a long-term lease that locks in a tenant at above-market rates can enhance sale value, just as a long-term lease that locks in a tenant at below-market rates can depress the sale value of a property. But the background vacancy rate, alone, does not establish whether a lease is above- or below-market (and in fact it may be possible to find good and bad lease deals among the balances of long-term leases for properties in the same neighborhood, especially if the leases were entered into at different times). Even with a relatively high vacancy rate, a long-term lease obligation at cheap rates (think 40 years at one dollar per year) could deflate the encumbered property's value, while a long-term lease at steep rates (40 years at a billion dollars a year, for example) could inflate the encumbered property's value even in an area with a very low vacancy rate. The point of Ohio's statutory scheme is to endeavor to separate out, where possible, value attributable to having the lease itself (value not subject to the property tax) and value attributable to the "fee simple estate, as if unencumbered" (value that is subject to the property tax).

{¶ 17} Menlo cites an appraisal authority that recognizes the basic concept. "If the rent and/or terms of the lease are favorable to the landlord (lessor), the value of the leased fee interest will usually be greater than the value of the fee simple interest, resulting in a negative leasehold interest. If the rent and/or terms of the lease are favorable to the tenant (or lessee), the value of the leased fee interest will usually be less than the value of the fee simple interest, resulting in a positive leasehold interest. * * * * The negative or positive leasehold interests will cease if contract rent and/or terms equal market rent and/or terms any time during the lesae or when the lease expires." Appellant's Brief at 10-11, quoting *The Appraisal of Real Estate*, 12th Ed., at 82 and supplying emphasis.

{¶ 18} But Menlo translates this truism by saying that "[p]ositive leased fee value (here, a long term lease at 100% occupancy) is offset by a corresponding negative leasehold value (market conditions at a 10% vacancy) and vice-versa"—without ever attempting to follow the book's explanation by assessing the "rent and/or terms of the lease" as a whole,

gauging whether they are favorable or unfavorable to the lessor, and thus showing whether the property's "leased fee interest" is above or below its "fee simple interest." *See* Appellant's Brief at 11. Simply reciting vacancy rates doesn't do the trick.

{¶ 19} Beyond its appraiser's views on discounting by vacancy rates, Menlo has not attempted to show us where the record establishes that the lease terms themselves were not at market value as of the sale date. If the lease was not at market value at the time the property was sold (whether because of a change over time in prevailing occupancy/vacancy rates or in other ambient conditions that could drive the value of the lease up or down), its remaining duration could well inform a determination of by how much the sale price should be adjusted in order to reach unencumbered property value, but Menlo does not direct us to any meaningful such discussion in the record.

{¶ 20} Indeed, Menlo stipulates that "[t]he lease rate of $26.85 per square foot is not at issue in this appeal, only the narrow issue of whether the sale price should have been adjusted to reflect market occupancy." Reply Brief at 3. Menlo simply asserts that "properties that are not 100% occupied would presumably be valued at a lesser value" than the Menlo property, *id.* at 4, but whether a vacant property would be valued less or more highly than the same property with the lease Menlo inherited could depend in significant part on whether the lease was more favorable to the landlord than prevailing market rents, or less favorable. While the property owner in *Terraza* " 'presented appraisal evidence that purports to explain why the sale price did not reflect the value of the unencumbered fee-simple estate,' " Reply Brief at 4, quoting *Terazza*, 2017-Ohio-4415, at ¶ 39, Menlo has assayed no such explanation. Menlo suggests under its first assignment of error that the lease in place at the time of sale did not "reflect[] market terms at the time" of sale, *see* Appellant's Brief at 6 (capitalizations adjusted), but Menlo undertakes no showing to that effect beyond its appraiser's postulation (made in light of background vacancy numbers) of a $25.00 per square foot rate that the BTA was not bound to credit. *See id.* at 7 (Menlo submits that its appraiser's "conclusion of market rent at $25.00 per square foot [Koon Appraisal at page D-5] was very close to the contract rent under the lease at $26.85 per square foot").

{¶ 21} To be sure, "the difference between actual rent and market rent is only one factor that might make an existing lease affect the sale price"; factors such as tenant

creditworthiness and whether the lease is a net lease also can influence such analysis. *GC Net Lease @(3) (Westerville) Investors, L.L.C. v. Franklin Cty. Bd. of Revision*, 154 Ohio St.3d 121, 2018-Ohio-3856, ¶ 10. Here, however, Menlo makes no "creditworthiness" or "net lease" arguments. Despite stipulating under its first assignment of error that the "fee simple standard * * * requires an inquiry into whether a lease in place reflects market terms at the time of a sale," Appellant's Brief at 6, Menlo really makes no arguments specific to the terms of the lease in contending that the lease had an effect on the sale price. Again, Menlo does not argue from the particular duration of the lease, or the monthly rental fee, or the character of the tenant; it does not look to "whether [the] lease in place reflects market terms," but only to the fact that a long-term lease exists at all. And it cites no precedential authority showing that its simple incantation of area vacancy rates permits us to gainsay the BTA's conclusions.

{¶ 22} Nor does Menlo's reference to Ohio Administrative Code Rule 5703-25-07(D)(2) and that subsection's description of "[t]he income approach" to estimating true value as needing to account for "normal vacancies," *see* Appellant's Brief at 9-10, establish that recent sale prices of leased property automatically have to be discounted in light of prevailing vacancy rates. It does not show as a matter of law, that is, that the BTA's failure automatically to discount any sale price of leased property given neighborhood vacancy rates "makes no sense." *Compare* Reply Brief at 2. And the Supreme Court of Ohio has noted that "the administrative rule * * * does not mandate a particular methodology for appraising a property's value" and "does not require the use of the income approach in every valuation * * *." *Terraza*, 2017-Ohio-4415 at ¶ 38.

{¶ 23} Without more, we cannot adopt Menlo's argument that the Walgreens sale price used as a comparable sale in its appraiser's review needed to be discounted by that factor, too, even absent consideration of any other factors. *Compare* Appellant's Brief at 9. The BTA did consider Menlo's appraisal evidence, but would have been justified in considering the appraisal report truncated in explaining why and how that vacancy rate adjustment was required in this context, *see* Menlo's Ex. 1 at D-5 to D-6 (using a "vacancy and collection loss factor of 7.5%," without examination of why the lessee and lessor might not themselves have taken neighborhood vacancy rates into account in their bargaining, thus moving the lease toward market value, and without any further analysis of the discount

rationale in this particular context). We find nothing on this record that compelled the BTA to adopt the appraisal's bottom line to the exclusion of the sale price evidence.

{¶ 24} This does not appear to be a case like *GC Net Lease* where the BTA deemed a proffered appraisal not relevant, 2018-Ohio-3856 at ¶ 9, or that decision's precursor, *Westerville City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 154 Ohio St.3d 308, 2018-Ohio-3855, ¶ 1, 13, which underscored that the BTA had acted "without considering the appraisal offered" and which emphasized that "**no threshold showing is required before a tax tribunal must give full consideration to appraisal evidence**." Rather, the BTA here did review the appraisal submitted by Menlo as non-sale evidence. The BTA offered a reasoned explanation for its disagreement with the appraisal's conclusions, and it found that the rebuttable presumption of true fee simple value created by the arms-length sale had not been overcome. On this record and with the minimalist argument Menlo posits, we are not in a position to find that the evidence the BTA weighed was not supported by the record, or to say that the BTA refused to consider the proffered appraisal, or to conclude that the BTA's determination was unreasonable or unlawful.

{¶ 25} The BTA professed itself open to considering "whether the lease was at market terms" and to taking into account factors "including the creditworthiness of the tenant" in determining whether the sale amount "did not reflect the property's unencumbered fee simple value." April 15, 2019 BTA Decision and Order at 2-3. But Menlo didn't really make that case, and its limited argument from background vacancy rates did not provide a sufficiently powerful lease-specific rationale that the BTA was required on this record to set aside the presumptive accuracy of the recent sale price as reflecting the property's true value as if unencumbered. And the BTA's own assessment of other lease and sale evidence does not show its conclusion to have been unreasonable. We overrule Menlo's two assignments of error and affirm the decision of the Board of Tax Appeals.

*Judgment affirmed.*

DORRIAN, J., concurs.
SADLER, J., concurs in judgment only.

_____